UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

YING HE,

    Plaintiff,

v.

ALBERTO GONZALES,
    et al.,

    Defendants.

Case No: 07-02765

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for YING HE, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4) The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5) The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6) FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7) Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8) The entries in the General Indices fall into two categories:

    (a) "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

    (b) "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9) In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a) Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b) Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c) Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 99.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

4

(10) The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11) When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12) If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13) There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14) The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15) The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16) Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17) Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(18)   At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)   The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)   Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

### GROWTH OF THE NAME CHECK PROGRAM

(21)   Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)   A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23)   In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 6,300 of those resubmitted requests remain pending.

(25) The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(26) There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name check requests, of which approximately 718,000 represented naturalization-related name checks and approximately 658,000 represented adjustment of status-related name checks. As of the end of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of which over 157,300 represented naturalization-related name checks and over 157,800 represented adjustment of status-related name checks.

(27) The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28) The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29) The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30) Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31) The FBI is seeking a number of improvements to its process. Over the short-term:

(32) NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(33) NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks. For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request. By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(34) The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)   NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)   NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)   As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)   As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. At this time fees do not cover the basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. This study is in its final phase.

(39) For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to complete the review once it has begun. While the FBI is sensitive to the impact of the delays in

processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)   It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(41)   The name check request for plaintiff YING HE was received by the FBI from USCIS on or about May 26, 2005 and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(42)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 24th day of September 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.