1 | SCOTT N. SCHOOLS, SC SBN 9990
United States Attorney
2 | JOANN M. SWANSON, CSBN 88143
Chief, Civil Division
3 | EDWARD A. OLSEN, CSBN 214150
Assistant United States Attorney
4 |
5 |      450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-6915
6 | FAX: (415) 436-6927
7 | Attorneys for Defendants
8 |
9 |                    UNITED STATES DISTRICT COURT
10 |               NORTHERN DISTRICT OF CALIFORNIA
11 |                         SAN JOSE DIVISION

12 | YING HE,                              )
                                          )   No. C 07-2765-HRL
13 |              Plaintiff,               )
                                          )
14 |         v.                           )
                                          )   **DEFENDANTS' OPPOSITION AND**
15 | ALBERTO GONZALES, United States Attorney )   **CROSS-MOTION FOR SUMMARY**
General, U.S. Department of Justice;  MICHAEL )   **JUDGMENT**
16 | CHERTOFF, Secretary,                  )
Department of Homeland Security; EMILIO )   Date:   November 6, 2007
17 | GONZALEZ, Director, U.S. Citizenship and )   Time:  10:00 a.m.
Immigration Services (USCIS); CHRISTINA )
18 | POULOS, Acting Director U.S. Citizenship and )
Immigration Services (USCIS); DAVID STILL, )
19 | San Francisco District Director, United States )
Citizenship and Immigration Services; ROBERT )
20 | S. MULLER, III, Director, Federal Bureau of )
Investigation.                        )
21 |                                      )
                                          )
22 |              Defendants.             )
_____

## I. INTRODUCTION

The plaintiff, Ying He, filed a Form I-485 application to adjust her status to lawful permanent

resident with the United States Citizenship and Immigration Services (USCIS) on May 9, 2005.

The I-485 application is pending with USCIS.  On May 25, 2007, plaintiff filed a mandamus

action, seeking to compel the defendants to adjudicate her I-485 application.  The plaintiff alleges

that the defendants have violated the Administrative Procedures Act (APA) by unreasonably

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  delaying the adjudication of the I-485 application and that she is entitled to an order directing the

2  USCIS to adjudicate the application.

3      This Court has scheduled a hearing on November 6, 2007.  The defendants hereby submit their

4  motion for summary judgment.

5                            **II. BACKGROUND**

6  **A. Adjustment of Status**

7      Section 245 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1255, authorizes

8  USCIS to adjust to permanent residence status certain aliens who have been admitted into the

9  United States.  However, adjustment of status is committed to the Attorney General's discretion as

10  a matter of law.  Section 1255(a) expressly provides:

11      The status of an alien who was inspected and admitted or paroled int the United States ...
       *may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he
12      may prescribe, to that of an alien lawfully admitted for permanent residence[.]

13  8 U.S.C. 1255(a) (emphasis added).

14      Significantly, the statute does not set forth any time frame in which a determination must be

15  made on an application to adjust status.  Nor is any time frame specified in the regulations setting

16  forth the procedures for aliens to apply to adjust status.  *See* 8 C.F.R. § 245 et. seq.

17  **B. The Number of I-485 Applications the Nebraska Service Center Processes**

18      The plaintiff's I-485 application for adjustment of status is being processed by the Nebraska

19  Service Center.  Declaration of Gerald Heinauer ¶ 3.  The Nebraska Service Center currently has

20  approximately 73,135 employment-based I-485 applications pending, about 17,741 of which are

21  still awaiting completion of FBI name checks before they can be adjudicated.  Heinauer

22  Declaration ¶ 20.  Of an additional 81,970 (estimated) pending asylum/refugee-based I-485

23  applications, there are approximately 10,340 awaiting FBI name check responses.  *See id.*  Of a

24  total figure of 84,355 naturalization filings currently being processed at the Nebraska Service

25  Center, there are approximately 21,728 awaiting responses on FBI name checks.  *See id.*

26  **C. Background Checks**

27      Before an alien's I-485 application can be adjudicated, USCIS, in conjunction with the FBI,

28  conducts several forms of security and background checks to ensure that the alien is eligible for

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  the benefit sought and that he or she is not a risk to national security or public safety. Heinauer

2  Declaration ¶ 11. USCIS also conducts investigations into the bona fides of petitions and

3  applications that have been filed, in order to maintain the integrity of the application process and

4  to ensure that there is no fraud in the application process. *See* 8 U.S.C. § 1105(a) (authorizing

5  "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the

6  Central Intelligence Agency and with other internal security officers of the Government for the

7  purpose of obtaining and exchanging information for use in enforcing the provisions of this

8  chapter in the interest of the internal and border security of the United States").

9      These checks currently include: (1) an FBI name check, which is run against FBI investigative

10  databases compiled by law enforcement agencies including administrative, applicant, criminal,

11  personnel and other files; (2) an FBI fingerprint check, which provides information relating to

12  criminal background within the United States; and (3) a check against the Interagency Border

13  Inspection System (IBIS), which contains records and information from more than 20 federal law

14  enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI, the

15  Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies, and is

16  used to compile information regarding national security risks, public safety concerns, and other

17  law enforcement concerns. *See* Heinauer Declaration ¶ 11.

18      These law enforcement checks have revealed significant derogatory information on various

19  alien applicants for immigration benefits, including applicants seeking permanent residency,

20  which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the

21  application. Heinauer Declaration ¶ 12. These law enforcement checks have also resulted in

22  aliens being arrested by law enforcement agencies or charged with removability from the United

23  States. *See id.* In many instances, the disqualifying information on the alien has been discovered

24  as a result of the IBIS or FBI name checks, but it has not been revealed by a fingerprint check

25  alone. *See id.*

26      Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and

27  thorough background checks on aliens who are seeking immigration status in the United States has

28  required procedures that sometimes result in individuals not receiving an adjudication of their

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  immigration application as quickly as in the past. Heinauer Declaration ¶ 13. In order to ensure

2  national security and public safety, as well as to reduce the waiting time for adjudication of

3  applications, USCIS is currently working with the Department of Justice and other agencies to

4  develop improved procedures that will ensure that all of the background checks are completed and

5  the results considered as quickly as possible. *See id.* However, the public safety requires USCIS

6  to make certain that the checks have been done before it adjudicates any application or petitions

7  and before it issues any immigration status documents to such persons. *See id.*

8      An alien who has filed an I-485 application may apply for and obtain employment

9  authorization for the entire time his or her application is pending. Heinauer Declaration ¶ 26.

10 Moreover, most I-485 applicants may apply for and obtain advance parole to enable them to travel

11 abroad during the pendency of their application. *See id.* Thus, I-485 applicants are generally not

12 significantly adversely affected by delays in adjudication of their applications, as are aliens filing

13 for other immigration benefits.

14 **D. The FBI Name Check**

15     The FBI's National Name Check Program's mission is to disseminate information from the

16 FBI's Central Records System (CRS) in response to requests from federal agencies such as USCIS.

17 Declaration of Michael Cannon ¶ 4. The CRS contains the FBI's administrative, personnel and

18 investigative files. *Id.* ¶ 5. The Program has grown exponentially since its genesis in the

19 Eisenhower administration, with more and more customers (federal agencies, the federal judiciary,

20 friendly foreign police and intelligence agencies, and state and local criminal justice agencies)

21 seeking background information from FBI files on individuals before bestowing a privilege, such

22 as government employment, a security clearance, attendance at a White House function, a green

23 card or naturalization, admission to the bar, or a visa. *Id.* ¶ 4. More than 70 federal, state, and

24 local agencies regularly request FBI name searches. *Id.*

25     When the FBI searches a person's name, the name is electronically checked against the FBI's

26 Universal Index. Cannon Declaration ¶ 11. The searches seek all instances of the individual's

27 name, social security number, and dates close to his or her date of birth, whether a main file or

28 reference file. *Id.* The names are searched in a multitude of combinations, switching the order of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1    first, last and middle names, and so on. *Id.* If there is a match with a name in a FBI record, it is

2    designated as a "Hit," meaning that the system has stopped on a possible match with the name

3    being checked. Cannon Declaration ¶ 12. If a search comes up with a match to a name and either

4    a birth date or security number, it is designated an "Ident." *Id.*

5        There are four stages involved in the completion of an individual name check: batch

6    processing, name searching, file review, and dissemination. The first stage in the process, batch

7    processing, involves the transfer of the name check requests from USCIS to the Name Check

8    Programs on magnetic tapes. The tapes are uploaded into an FBI system and the names are

9    electronically checked against the FBI's Universal Index (UNI). Historically, during the batch

10   processing stage, approximately 68 percent of name checks submitted by USCIS are electronically

11   checked and returned to USCIS as having "No Record" within 48-72 hours. Cannon Declaration ¶

12   13. A "No Record" indicates that the FBI's Universal Index database contains no identifiable

13   information regarding a particular individual. *Id.*

14       The second stage in the process is name searching. Cannon Declaration ¶ 14. For the name

15   check requests that are still pending after the initial electronic check, additional review is required.

16   *Id.* An FBI employee in the Name Check Program physically enters the applicant's name into the

17   computer database searching different fields and information. *Id.* A secondary manual name

18   search completed typically within 30-60 days historically identifies an additional 22 percent of the

19   USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. *Id.*

20   The results of this 22 percent also are returned to USCIS. *Id.*

21       The third and fourth stages in the process are file review and dissemination. The remaining 10

22   percent are identified as possibly being the subject of an FBI record. Cannon Declaration ¶ 14. At

23   that point, the FBI record must be retrieved and reviewed. *Id.* If the record was electronically

24   uploaded in the FBI;s electronic record-keeping system, it can be reviewed quickly. *Id.* If not,

25   however, the relevant information must be retrieved from an existing paper record. *Id.* Review of

26   this information will determine whether the information is identified with the request. Id. If the

27   information is not identified with the request, the request is closed as a "No Record" and USCIS is

28   so notified. *Id.* Additional searches against the FBI's Universal Index, additional manual name

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  searches, and/or additional file review of a name check request, depending on the length of time a

2  name check request is pending in the processing queue, may occur periodically during the name

3  check process to ensure that stale information is updated. Cannon Declaration ¶ 14.

4      Once a record is received, the FBI reviews the file for possible derogatory information.

5  Cannon Declaration ¶ 15. Less than 1 percent of USCIS's requests are identified with a file

6  containing possible derogatory information. *Id.* If appropriate, the FBI forwards a summary of the

7  derogatory information to USCIS. *Id.*

8      At each stage of the processing, the Name Check Program generally follows a first-in, first-

9  served protocol. Cannon Declaration ¶ 19. This protocol reflects that all applicants are equally

10  deserving and ensures that all applicants are treated fairly. *Id.* However, if an applicant's name

11  check requires a review of numerous FBI records and files, even though that person came in first,

12  the name check may require additional time until all responsive records are located and reviewed.

13  *Id.* The general exception to the first-in, first-served policy exists when USCIS directs that a name

14  check be handled on an "expedited" basis. *Id.* USICS determines which name checks are to be

15  expedited based on criteria it determines. *Id.* Once designated as an "expedite," that name check

16  proceeds to the front of the queue along with other prioritized name check requests, in front of the

17  others waiting to be processed. *Id.*

18      Prior to September 11, 2001, the FBI processed approximately 2.5 million name checks per

19  year. Cannon Declaration ¶ 16. As a result of the FBI's post-9/11 counterterrorism efforts, the

20  number of name checks has grown. *Id.* For fiscal year 2006, the FBI processed in excess of 3.4

21  million name checks. *Id.*

22      A significant portion of the incoming name checks submitted over the past few years has been

23  submitted by USCIS. Cannon Declaration ¶ 17-20. In fiscal year 2003, 64% of the total incoming

24  name checks were submitted by USCIS; in fiscal year 2004, 46% of the total incoming

25  checks were submitted by USCIS; in fiscal year 2005, 45% of the total incoming name checks

26  were submitted by USCIS; in fiscal year 2006, 45% of the total incoming name checks were

27  submitted by USCIS. *Id.*

28      In November of 2002, heightened national security concerns prompted a review of the former

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1   INS's procedures for investigating the backgrounds of individuals seeking immigration benefits.

2   Cannon Declaration ¶ 17-19. It was determined that deeper, more detailed clearance procedures

3   were required to protect the people and the interests of the United States effectively. *Id*. One of

4   the procedures identified was the FBI's name check clearance. *Id*. In December of 2002, and

5   January of 2003, the former INS resubmitted 2.7 million name check requests for background

6   investigations of all individuals with then-pending applications for immigration benefits for which

7   the Immigration and Nationality Act required background investigations. *Id*. Those 2.7 millions

8   requests were in addition to the regular submissions by the former INS. *Id*. Currently, the FBI has

9   returned an initial response to all 2.7 million resubmitted requests. *Id*. Moreover, although many

10  of the FBI's initial responses to those resubmitted requests indicated that the FBI had no

11  information relating to the specific individual who was the subject of the request, approximately

12  16 percent – or over 440,000 — resubmitted requests indicated that the FBI may have information

13  relating to the subject of the inquiry. *Id*.

14      The FBI's processing of those 440,000 resubmissions has delayed the processing of regular

15  submissions from USCIS. Cannon Declaration ¶ 18-19. A dedicated team with the FBI's National

16  Name Check Program has been assigned to handle only the re-submitted submissions from USCIS.

17  *Id*. To the extent the team members are working on only these applications, they are unavailable

18  to process the normal submissions which are completed on a first-in, first-out basis, unless

19  otherwise directed by USCIS. *Id*.

20      There are numerous factors that contribute to delays in the processing of name checks. Cannon

21  Declaration ¶ 20. One is the volume of incoming name checks – the total volume of name check

22  requests currently outpaces the FBI name check program's available resources to process the

23  incoming volume, in addition to being able to process those name checks currently pending. *Id*.

24  As it concerns submissions by USCIS, the fiscal year 2006, USCIS submitted approximately

25  1,633,000 name check requests, of which approximately 718,000 represented naturalization-

26  related name checks and approximately 658,000 represented adjustment of status-related name

27  checks. Id. Aa of the end of fiscal year 2006, the Name Check Program had over 364,600 pending

28  USCIS name check requests, of which over 157,300 represented naturalization-related name

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  checks and over 157,800 represented adjustment of status-related name checks. *Id.*

2      Second, the number of "hits" on a name when it is reviewed may further contribute to a delay

3  in processing a name check request. Cannon Declaration ¶ 20. A "hit" is a possible match with a

4  name in an FBI record. *Id.* The number of times the name appears in an FBI record correlates to

5  the number of records which require review. *Id.*

6      Third, the processing of common names also contributes to a delay in processing a name check

7  request. Cannon Declaration ¶ 11. The names associated with a name check request are searched

8  in a multitude of combinations, switching the order of first, last, and middle names, as well as

9  combinations with just the first and last, first and middle, and so on. *Id.* Without detailed

10 information in both the file and agency submissions, it is difficult to determine whether or not a

11 person with a common name is the same person mentioned in FBI records. *Id.* Common names

12 can often have more than 200 FBI records. *Id.*

13     Fourth, the accessibility of the FBI record needed for review also contributes to a delay in

14 processing a name check request. Cannon Declaration ¶ 20. If the date of the record is later than

15 October 1995, the record text may be available electronically; if the record predates October 1995,

16 the paper record has to be located, pulled, and reviewed. *Id.* A record could be at one of year 265

17 possible locations across the country. *Id.* Requests often involve coordinating the retrieval and

18 review of files from the various 56 different FBI field offices. *Id.* One person's name check may

19 involve locating and reviewing numerous files, all at different physical locations. *Id.* Since is a

20 paper-based process, it is a process subject to misplaced or misfiled files. *Id.* The process is time

21 consuming and labor intensive. *Id.*

22     Fifth, processing a request to expedite the processing of an FBI name check means that an

23 employee is not available to work on a normal name check request. Cannon Declaration ¶ 19. As

24 directed by USCIS specifically, the FBI processes name check requests on a first-in, first-out basis,

25 unless USCIS directs that a name check be expedited. *Id.*

26 **E. The Plaintiff's I-485 Application**

27     The plaintiff is a citizen of the People's Republic of China. Declaration of Gerald Heinauer ¶

28 3. She filed her I-485 application with USCIS on May 9, 2005. Heinauer Declaration ¶ 3. The I-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  485 application is based on an I-140 visa petition that was approved on September 15, 2005.

2  Heinauer Declaration ¶ 5. The USCIS submitted a name check request to the FBI on May 18,

3  2005. Heinauer Declaration ¶ 18. The FBI acknowledged receipt of the name check request on

4  May 26, 2005. *See id.*; Cannon Declaration ¶ 41. The plaintiff was fingerprinted on October 6,

5  2005, and again on March 20, 2007, to ensure that her fingerprint return is current once the FBI

6  name check clears.[1] Heinauer Declaration ¶ 15. The plaintiff's preliminary IBIS check has been

7  completed. Heinauer Declaration ¶ 16. Any remaining IBIS check will be performed by the

8  adjudicating officer at the time of final adjudication if deemed necessary. *See id.* The plaintiff's I-

9  485 application was transferred from the California Service Center to the Nebraska Service Center

10  on March 14, 2007, for completion of the adjudication, in light of the fact that the USCIS

11  realigned workload among the Service centers. Heinauer Declaration ¶ 3.

12      Most applicants for adjustment of status may apply for and be granted (usually in one-year

13  increments) work authorization documents and advance parole documents to enable them to travel

14  abroad while their application is pending. Heinauer Declaration ¶ 26. The plaintiff currently

15  holds a work authorization document permitting her to work through the middle of 2008. Id. The

16  plaintiff also has an advance parole travel document which is valid through May 20, 2008. *Id.*

17  The Nebraska Service Center is processing the plaintiff's I-485 application in accordance with

18  standard procedures. Heinauer Declaration ¶ 27.

19              **III. SUMMARY JUDGMENT METHODOLOGY**

20      This Court shall grant summary judgment when it finds that "there is no genuine issue as to any

21  material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

22  P. 56(c); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

23                      **IV. ARGUMENT**

24  **A. All Named Defendants Except Chertoff Should Be Dismissed**

25      Since March 1, 2003, the Department of Homeland Security has been the agency responsible

26  for implementing the Immigration and Nationality Act. *See* 6 U.S.C. §§ 271(b)(5), 557. Thus, the

27  _____

28      [1]The fingerprint check must be less than fifteen months old at the time any application or
petition is adjudicated. Heinauer Declaration ¶ 15.
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1 | only relevant Defendant here is Michael Chertoff, in his capacity as Secretary of the Department of

2 | Homeland Security, and Defendant Robert S. Mueller should be dismissed. *See Konchitsky v.*

3 | *Chertoff*, No. C-07-00294 RMW, 2007 WL 2070325, at *6-7 (N.D. Cal. July 13, 2007); *Dmitriev*

4 | *v. Chertoff,* No. C 06-7677 JW, 2007 WL 1319533, at *4 (N.D. Cal. May 4, 2007); *Clayton v.*

5 | *Chertoff*, C-07-2781-CW (N.D. Cal. Oct. 1, 2007).

6 | **B. Relief Is Unavailable Under The Mandamus Act and the APA**

7 |     Mandamus is reserved for those situations in which the agency has a ministerial,

8 | nondiscretionary duty that is so plainly prescribed as to be free from doubt. *See Kildare v. Saenz,*

9 | 325 F.3d 1078, 1084 (9th Cir. 2003). A ministerial act is "devoid of the exercise of judgment or

10 | discretion." *Harmon Cove Condominium Ass'n, Inc. v. Marsh*, 815 F.2d 949, 951 (3d Cir. 1987).

11 | A duty is ministerial "where the officer can do only one thing." *Work v. United States*, 267 U.S.

12 | 175, 177 (1925). Courts have consistently recognized that "the remedy of mandamus is a drastic

13 | one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.*, 449

14 | U.S. 33, 34 (1980).

15 |     Similarly, a court has jurisdiction to act under section 706(1) of the APA (authorizing courts to

16 | "compel agency action . . . unreasonably delayed") only when "an agency is compelled by law to

17 | act within a certain time period," but the agency has failed to comply with that time period. *See*

18 | *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004). As an example, the

19 | Supreme Court in *Norton* stated that the Federal Communications Commission's failure to

20 | establish regulations within 6 months of the date of the Telecommunications Act of 1996, as

21 | required by the Act, "would have supported a judicial decree under the APA requiring the prompt

22 | issuance of regulations." *See id.* "The principal purpose of the APA limitations we have

23 | discussed – and of the traditional limitations upon mandamus from which they are derived – is to

24 | protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial

25 | entanglement in abstract policy disagreements which courts lack both expertise and information to

26 | resolve." *Norton*, 542 U.S. at 66.

27 |     Here, neither the statute nor the regulations that govern I-485 applications specify a time

28 | period within which USICS must adjudicate a I-485 application. In fact, the entire adjudicatory

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1    process lies within the discretion of the Attorney General. *See* 8 U.S.C. § 1255(a) (an alien's

2    status "may be adjusted by the Attorney General, in his discretion and under such regulations as he

3    may prescribe."); 8 C.F.R. § 103.2(b)(7) ("[The agency] may direct any necessary investigation");

4    8 C.F.R. § 103.2(b)(18) ("A district director may authorize withholding adjudication"); 8 C.F.R. §

5    245.6 (an "interview may be waived . . . when it is determined by the Service that an interview is

6    not necessary"). Although USCIS must eventually notify an applicant of its decision on a I-485

7    application, *see* 8 C.F.R. § 245.2, the applicant is not entitled to a decision within any particular

8    time frame. *See Sharif v. Chertoff*, ___ F. Supp. 2d ___, 2007 WL 2045489, at * 5 (N.D. Ill. July

9    18, 2007).

10       Congress clearly knows how to provide a deadline for processing an application for an

11    immigration benefit, but chose to remain silent in the context of I-485 applications. For example,

12    Congress provided that an application for naturalization must be processed within 120 days after

13    the date the applicant is examined. *See* 8 U.S.C. § 1447(b). The Immigration and Nationality Act

14    provides no time frame for processing an I-485 application. Accordingly, under *Norton*, this Court

15    is unable, under either the mandamus statute or the APA, to direct USCIS to act within a specific

16    time period on the plaintiff's I-485 application. *See Norton*, 542 U.S. at 65.

17       Moreover, the FBI name check involves a discretionary function. *See Yan v. Mueller*, No. H-

18    07-0313, 2007 WL 1521732, at * 6 (S.D. Tex. May 24, 2007) ("The evidence shows that the delay

19    is due, not only to the volume of requests that the FBI receives, but also to the FBI's exercise of

20    discretion in determining the timing for conducting the many name check requests that it receives

21    and the manner in which to conduct those checks."); *see also Shalabi v. Gonzales*, 2006 WL

22    3032413, at *5 (E.D. Mo. Oct. 23, 2006) ("A background check that is rushed or incomplete due to

23    an artificial court imposed deadline would not meet the statutory and regulatory requirements of a

24    'full criminal background check' before the USCIS can make a determination on an application.");

25    *id.* ("There is no statute or regulation which imposes a deadline for the FBI to complete a criminal

26    background check."); *Sozanski v. Chertoff*, No. 06-CV-0993 (N.D. Tex. Dec. 11, 2006) (holding

27    that district court lacks jurisdiction to compel the FBI to perform name checks in adjustment of

28    status cases). The extent of the FBI's discretion in conducting immigration name checks is

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1    underscored by recently passed legislation seeking to reduce backlogs in personnel-related

2    background checks. *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No.

3    108-458 § 3001(g), 118 Stat. 3638 (2004) (requiring 90% of personnel security clearances to be

4    completed on average of 60 days "to the extent practical"). Had it wished to do so, Congress

5    could have enacted deadlines for the performance of FBI's immigration name checks, and could

6    have subjected this process to judicial review.

7        Consequently, the defendants have no clear, mandatory duty to process a name check or to

8    adjudicate the plaintiffs' applications within any particular time frame. In failing to specify any

9    temporal limitations, and in leaving it to the agency to prescribe any appropriate regulations,

10    Congress vested USCIS Attorney General with complete discretion over the process of

11    adjudicating an I-485 application. Accordingly, this Court lacks jurisdiction over the plaintiff's

12    mandamus and APA claims. *See Li v. Chertoff*, 482 F. Supp. 2d 1172, 1177 (S.D. Cal. 2007);

13    *Zheng v. Reno*, 166 F. Supp. 2d 875, 880-81 (S.D. Cal. 2001) ("Matters within the INS's discretion

14    are not reviewable under the mandamus statute. Thus, courts in this district have repeatedly held

15    that mandamus relief is unavailable for delays in the adjustment process."); *Safadi v. Howard*, 466

16    F. Supp. 2d 696, 698-700 (E.D. Va. 2006) (concluding that § 1255(a) vests USICS with discretion

17    over the entire process of adjustment application adjudication); *Grinberg v. Swacina*, 478 F. Supp.

18    2d 1350, 1351 (S.D. Fla. 2007) ("Sections 242 and 245 of the Immigration and Nationality Act . . .

19    preclude judicial review of any discretionary "decision or action' of the Attorney General in

20    immigration matters includ[ing] the pace at which immigration decisions are made.").[2]

21

22

23

24        [2]The defendants acknowledge that a number of other courts, including judges from this

25    district, have held to the contrary. *See, e.g., Dong v. Chertoff*, C-07-266-SBA, 2007 WL
2601107 (N.D. Cal. 2007); *Konchitsky v. Chertoff*, 2007 WL 2070325, at *3 (N.D. Cal. 2007);

26    *Toor v. Still*, 2007 WL 2028407, at *2 (N.D. Cal. 2007); *Fu v. Gonzales*, C-07-207 (N.D. Cal.
2007); *Dmitriev v. Chertoff*, 2007 WL 1319533, at *3 (N.D. Cal. 2007); *Wu v. Chertoff*, 2007

27    WL 1223858, at *3 (N.D. Cal. 2007); *Baker v. Still*, 2007 WL 1393750, at *2 (N.D. Cal. 2007);

28    Gelfer v. Chertoff, 2007 WL 902382 (N.D. Cal. 2007); *Singh v. Still*, 470 F. Supp. 2d 1064, 1067
(N.D. Cal. 2007); *Yu v. Brown*, 36 F. Supp. 2d 922, 932 (D.N.M. 1999).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  **C. 8 U.S.C. § 1252(a)(2)(B)**

2      This Court is also barred from reviewing this action under 8 U.S.C. § 1252(a)(2)(B), which

3  provides:

4      (B) Denials of discretionary relief

5          Notwithstanding any other provision of law (statutory or nonstatutory), including
           section 2241 of Title 28, or any other habeas corpus provision, and sections 1361
6          and 1651 of such title, and except as provided in subparagraph (D), and regardless
           of whether the judgment, decision, or action is made in removal proceedings, **no**
7          **court shall have jurisdiction to review --**

8          (i) **any judgment regarding the granting of relief** under section 1182(h), 1182(i),
           1229b, 1229c, or 1255 of this title, or
9
           (ii) **any other decision or action of the Attorney General or the Secretary of**
10         **Homeland Security the authority for which is specified under this subchapter**
           **to be in the discretion of the Attorney General or the Secretary of Homeland**
11         **Security**, other than the granting of relief under section 1158(a) of this title.

12  8 U.S.C. § 1252(a)(2)(B) (emphasis added)

13      8 U.S.C. § 1255, to which 8 U.S.C. § 1252(a)(2)(B) refers, provides:

14          (a) Status as person admitted for permanent residence on application and
           eligibility for immigrant visa
15
           **The status of an alien** who was inspected and admitted or paroled into the
16         United States or the status of any other alien having an approved petition for
           classification as VAWA self-petitioner **may be adjusted by the Attorney General,**
17         **in his discretion and under such regulations as he may prescribe**, to that of an
           alien lawfully admitted for permanent residence if (1) the alien makes an application
18         for such adjustment, (2) the alien is eligible to receive an immigrant visa and is
           admissible to the United States for permanent residence, and (3) an immigrant visa
19         is immediately available to him at the time his application is filed.

20  8 U.S.C. § 1255 (emphasis added).

21      The reference in 8 U.S.C. § 1252(a)(2)(B)(ii) to "action of the Attorney General or the

22  Secretary of Homeland Security" encompasses the pace at which USCIS processes an I-485

23  application. In *Safadi v. Howard*, 466 F. Supp. 2d 696 (E.D. Va. 2006), for example, the United

24  States District Court for the Eastern District of Virginia concluded that the term "action,"

25  "encompasses any act or series of acts that are discretionary within the adjustment of status

26  process . . . action . . . encompasses the entire process of reviewing an adjustment application,

27  including the completion of background and security checks and the pace at which the process

28  proceeds." *Safadi*, 466 F. Supp. 2d at 699; *see also Grinberg v. Swacina*, 478 F. Supp. 2d 1350

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1   (S.D. Fla. 2007) (electing "to follow the majority of courts that have dismissed similar actions for

2   lack of subject matter jurisdiction, under the rationale that Sections 242 and 245 of the [INA], 8

3   U.S.C. §§ 1255(a), 1252(a)(2)(B)(ii) (2006, as amended in 2005, preclude judicial review of any

4   discretionary 'decision or action' of the Attorney General in immigration matters"); *Li v. Chertoff*,

5   482 F. Supp. 2d 1172, 1177 (S.D. Cal. 2007) ("These statutes clearly convey Congress' intent to

6   preclude courts from reviewing discretionary decisions or actions of USCIS regarding I-485

7   applications"); *Eldeeb v. Chertoff*, 2007 WL 2209231, at *13 (M.D. Fla. 2007) ("Therefore, this

8   Court has elected to interpret the § 1252(a)(2)(B)(ii) jurisdictional bar broadly, and has concluded

9   that the pace of adjudication of an 1485 application is a discretionary function of the CIS"); *see*

10  *also Borisov v. Gonzales*, CV 06-8240-VBF; *Mustafa v. Pasquerell*, No. Civ.SA05CA-658-XR,

11  2006 WL 488399 (W.D. Tex. Jan. 10, 2006); *Zaytsev v. Gantner*, No. 04Civ.7101 WHP, 2004 WL

12  2251665 (S.D.N.Y. Sept. 24, 2004). *But see Dong v. Chertoff*, C-07-266-SBA, 2007 WL 2601107

13  (N.D. Cal. Sept. 6, 2007) (rejecting argument that 8 U.S.C. § 1252(a)(2)(B)(ii) deprives the court

14  of jurisdiction to hearing a claim that an adjudication of an adjustment of status application has

15  been unlawfully withheld); *Cao v. Upchurch*, ___ F. Supp. 2d ___, 2007 WL 2071900, at *2 (E.D.

16  Pa. 2007) ("While 8 U.S.C. § 1255(a) specifically places the decision of whether to adjust status in

17  the discretion of the Attorney General, it says nothing about the pace of such a decision, and

18  certainly does not confer on the Attorney General discretion to let a petition languish

19  indefinitely"); *Elmaky v. Upchurch*, No. 3:06-CV-2359-B, 2007 WL 944330 (N.D. Tex. Mar. 28,

20  2007); *Duan v. Zamberry*, 2007 WL 626116, at *2 (section 1252(a)(2)(B)(ii) strips jurisdiction to

21  review only those decisions within the Attorney General's discretion as specified in the statute,

22  namely, the decision to adjust status, not the pace of the application processing).

23     "[T]he ultimate decision to grant or deny an application lies within the discretion of the CIS. It

24  would make little sense to allow a court to review the pace of processing of an application, where

25  the ultimate decision to grant or deny an application is entrusted to the discretion of the agency."

26  *Borisov v. Gonzales*, CV 06-8240-VBF, at 7.

27     In sum, this Court lacks jurisdiction to review the pace at which the FBI and USCIS complete

28  the name check and adjudicate the plaintiff's I-485 application.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

**D. The Delay is Reasonable**

Even if this Court were to find jurisdiction, any delay in the processing of the plaintiff's I-485 application has been reasonable.

To determine whether a delay is egregious, such that relief under the APA is warranted, several circuits have adopted the test first articulated in *Telecomm. Research and Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"). As outlined in *TRAC*, the factors for consideration include:

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulations are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay;
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80.

Courts have consistently cautioned against "engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 525 (1978). Where "there are no allegations of bad faith, a dilatory attitude, or a lack of evenhandedness on the part of the agency, the reasonableness of the delays in terms of the legislatively imposed 'reasonable dispatch' duty must be judged in light of the resources that Congress has supplied, as well as the impact of the delays on the applicants' interests." *Wright v. Califano*, 587 F.2d 345, 353 (7th Cir. 1978).

The court in *Sze v. INS*, No. C 97-0569 SC, 1997 WL 446236, at *8 (N.D. Cal. Jul. 24, 1997), which applied the *TRAC* test to a similar complained-of delay in the immigration context, found the fourth factor to be the most persuasive. *Id.* at *8. The court, in refusing to grant relief under

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1 the APA, held that "the reasonableness of administrative delays must be judged in light of the

2 resources available to the agency." *Id*. The court also recognized that by granting relief, it

3 "would, at best, reorder the queue of applications, thereby leading to little net benefit." *Id.*; *see*

4 *also Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) (granting deference to

5 agency's decision on how to handle competing applications for permanent labor certifications); *Li*

6 *v. Gonzales*, No. 06-5911 (SRC), 2007 WL 1303000, *6 (D.N.J. May 3, 2007) "[I]t is ill-advised

7 for courts to interfere with otherwise unreviewable agency decisions.  When, as here, the Court

8 lacks power to review the ultimate agency decision and the agency's cases are backlogged,

9 granting the writ to compel adjudication would do nothing more than shuffle to the front of the

10 line those I-485 applicants canny enough to file a Complaint in federal district court.").

11     The first TRAC factor requires an agency to govern decision-making with a rule of reason.

12 *TRAC*, 750 F. 2d at 80.  Given the large volume of petitions and applications requiring

13 adjudication, the extensive background check that is required for national security and public

14 safety, the exponential growth in the number of name checks the FBI must completed, and the

15 limited resources available to the agencies, the FBI and the USCIS are proceeding in an orderly

16 fashion with the completion of name checks in the order in which they are received and the

17 adjudication of I-485 applications once all required background checks have been completed

18 Heinauer Declaration ¶ 18; Cannon Declaration ¶¶18-40.  In the plaintiff's case, this means that

19 USCIS must await the results of the FBI name check before deciding the plaintiff's I-485

20 application, and the FBI must be given time to perform an accurate and thorough check. *See In re*

21 *Barr Lab. Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("The agency is in a unique and authoritative

22 position to view its projects as a whole, estimate the prospects for each, and allocate its resources

23 in the optimal way.").

24     The second *TRAC* factor does not apply to the present case because there is neither a statutory

25 requirement that the FBI process the name check nor one requiring USCIS to adjudicate the

26 application within a certain amount of time. *Cf.* Contra Intelligence Reform and Terrorism

27 Prevention Act of 2004, Pub. L. No. 108-458, § 3001(g), 118 Stat. 3638 (2004) (requiring

28 Government personnel security checks to be completed within a certain time frame).  Additionally,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1   Congress has not provided any clear guidelines indicating the speed at which the FBI and USCIS

2   should conduct its adjudications.   Congress has, however, required that USCIS conduct certain

3   criminal and national security background checks to ensure eligibility for adjustment of status.

4   *See* 8 U.S.C. §1255(a).

5        Where there are no statutory guidelines, and in order to establish a "rule of reason," this Court

6   must consider the factors that contribute to the backlogs that both the FBI and USCIS face. *See,*

7   *e.g., INS v. Miranda*, 459 U.S. 14, 18 (1982) ("Both the number of the applications received by the

8   INS and the need to investigate their validity may make it difficult for the agency to process an

9   application as promptly as may be desirable"). The Declarations of Gerard Heinauer and Michael

10  Cannon detail the name check program and its necessity, and explain the various causes of delays

11  in processing name checks.  Heinauer Declaration ¶¶ 10-12; Cannon Declaration ¶¶ 17-21.

12       The third factor is the impact the delay has on human health, welfare, and economic harm to

13  plaintiffs. This factor's analysis overlaps with the analysis of the fifth *TRAC* factor, the nature and

14  extent of the interests prejudiced by the delay. *TRAC*, 750 F.2d at 80; *Liberty Fund*, 394 F. Supp.

15  2d at 118. The plaintiff may be inconvenienced by the delay in adjudication, but this individual

16  interest cannot outweigh defendants' interests in fully and accurately completing each name check.

17  Security background checks for individuals seeking immigration benefits is a key component to

18  our nation's national security. *See* The 9/11 Commission Report, 2004 WL 1634382 at 352 (July

19  22, 2004) (finding that, "had the immigration system set a higher bar for determining whether

20  individuals are who or what they claim to be....it could have potentially have excluded, removed,

21  or come into further contact with several hijackers who did not appear to meet the terms for

22  admitting short-term visitors.").

23       In most cases, the adverse impact caused by the delay is not substantial.  Applicants for

24  adjustment of status who have pending applications may apply for and obtain employment

25  authorization for the entire time the application is pending. *See* Heinauer Declaration ¶ 21.

26  Additionally, most applicants may also apply for and receive advance parole to enable them to

27  travel abroad during the pendency of their application.  *Id.*   Here, the plaintiff has a work permit

28  that is valid through the middle of 2008 and an advance parole travel document that is valid

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1    through May 20, 2008.  Heinauer Declaration ¶ 26.  Even when a more substantial impact is felt by

2    an applicant, this impact, "is unlikely to rise to the level that would significantly change the

3    Court's assessment of the unreasonableness of the delay in light of the importance of the agency's

4    competing priorities." *Liberty Fund*, 394 F. Supp. 2d at 118.  As the highest of priorities, "our

5    national security requires that caution and thoroughness in these matters not be sacrificed for the

6    sake of expediency." *Safadi v. Howard*, 466 F. Supp. 2d 696, 701 (E.D. Va. 2006).  Although a

7    delay in processing may have a negative impact, "nevertheless, in this post-9/11 context, agencies

8    must have the freedom to carefully and thoroughly investigate these applications without judicial

9    interference in their priorities." *Patil v. Mueller, et al.*, No. C 07cv71 JCC, 2007 WL 1302752 at

10   *2 (E.D. Va. Apr. 30, 2007) (holding that the Court had no jurisdiction to issue a writ of

11   mandamus due to legal and policy considerations).  Thus, when balancing the agencies' interests

12   in defending against threats to national security against the plaintiff's interest in adjudication, the

13   interests of the nation must prevail.

14       Similarly, the effect of expediting delayed agency action under the fourth *TRAC* factor would

15   unquestionably impinge upon agency activities and responsibilities of a higher priority.  Such an

16   order would intrude on the agency's discretion and ability to fulfill its highest priority of

17   safeguarding the nation.  *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1027 (7th Cir.

18   2002) ("the government's interest in preventing terrorism is not only important but paramount");

19   *see also Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998) ("The Government's interests in the

20   administration of its immigration laws and in preventing [immigration related] document fraud are

21   likewise considerable.").

22       Delays in the processing of FBI name checks arise for a variety of reasons.  First, USCIS is not

23   the only agency that engages in the FBI name check program, and notably, the FBI and USCIS

24   processes do not occur in vacuums.  Any requirement that the FBI or USCIS process the plaintiff's

25   name check or application within a particular time limit will have the unfortunate side effect of

26   slowing the processing for other applicants who are also awaiting action on their applications for

27   immigration benefits.  Absent compelling reasons, moving some individuals to the front of the

28   queue would simply move that group ahead of others who also had been waiting, resulting in no

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  net gain in processing. *See In re Barr Lab.*, 930 F.2d at 75; *Mashpee Wampanoag Tribal Council,*

2  *Inc. v. Norton*, 336 F.3d 1094, 1101 (D.C. Cir. 2003). Furthermore, ordering plaintiff's case to the

3  front of the line sets the precedent that the more litigious applicants are most likely to move to the

4  top of the pile at the expense of other applicants that have waited even longer, but may not have

5  the resources to file suit. *Manzoor v. Chertoff*, 472 F. Supp 2d 801, 809 (E.D. Va. 2007); *see also*

6  *Yan*, 2007 WL 1521732 at *7 (holding that a grant of review of petitioner's claims would only,

7  "encourage other applicants to file suit to receive expedited treatment rather than wait their turn in

8  line.").

9      Moreover, the courts have been cautioned against "engrafting their own notions of proper

10  procedures upon agencies entrusted with substantive functions by Congress." *Vermont Yankee*

11  *Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 525 (1978).

12  Here, where "there are no allegations of bad faith, a dilatory attitude, or a lack of evenhandedness

13  on the part of the agency, the reasonableness of the delays in terms of the legislatively imposed

14  'reasonable dispatch' duty must be judged in light of the resources that Congress has supplied, as

15  well as the impact of the delays on the applicants' interests." *Wright*, 587 F.2d at 353. The

16  complexity of agency investigations, as well as the extent that the individual applicants

17  contributed to delays, also enter into a court's deliberations. *See Saleh v. Ridge*, 367 F. Supp. 2d

18  508, 512 (S.D.N.Y. 2005). An agency's good faith efforts to address delays militate against a

19  finding of unreasonableness. *See Wright*, 587 F.2d at 345.

20      The sixth and last *TRAC* factor provides that a court need not find impropriety to hold that an

21  agency action is unreasonably delayed. Conversely, "the good faith of the agency in addressing

22  the delay weighs against mandamus." *Liberty Fund*, 394 F. Supp. 2d at 120. Here, the delay is due

23  to the pendency of the plaintiff's FBI name check, which both the FBI and USCIS state is essential

24  to ensuring the safety of the public.

25      Given the large volume of petitions and applications requiring adjudication, the extensive

26  background check that is required for national security and public safety, and the limited resources

27  available to the agencies, the FBI and USCIS are proceeding in an orderly fashion with the

28  processing of the name check and the adjudication of the plaintiff's application for adjustment of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL

1  status.  The USCIS has ensured that the plaintiff's fingerprints are current, has completed the

2  plaintiff's preliminary IBIS check, and is prepared to adjudicate the plaintiff's I-485 application

3  upon receipt of the FBI name check result.  Heinauer Declaration ¶ 9.  Contrary to the plaintiff's

4  intimations, the failure to complete adjudication of her application is not arbitrary, nor is it

5  unreasonably delayed..

## V. CONCLUSION

7       For the foregoing reasons, Defendants respectfully ask this Court to grant the defendants'

8  motion for summary judgment, and dismiss the plaintiff's action in its entirety.

9

10  Dated:   October 2, 2007                         Respectfully submitted,

11                                                   SCOTT N. SCHOOLS
                                                     United States Attorney
12

13

14                                                        /s/
                                                     EDWARD A. OLSEN
15                                                   Assistant United States Attorney
                                                     Attorneys for Defendants

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2765-HRL